TJT/JPL:AA/LS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

RENAT ABRAMOV,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN SUPPORT OF APPLICATION FOR ARREST WARRANT

(18 U.S.C. § 1956(h))

24-MJ- 540

EASTERN DISTRICT OF NEW YORK, SS:

Catherine Tota, being duly sworn, deposes and states that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

In or about and between September 2023 and September 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant RENAT ABRAMOV ("ABRAMOV"), together with others, did knowingly and intentionally conspire to conduct one or more financial transactions in and affecting interstate and foreign commerce, which financial transactions in fact involved the proceeds of one or more specified unlawful activities, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, and acts and activities constituting an offense involving a federal health care offense, in violation of Title 18, United States Code, Sections 1347 and 1349, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the

nature, the location, the source, the ownership and the control of the proceeds of the specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h))

The source of your deponent's information and the grounds for her belief are as follows:[1]

1. I am a Special Agent with the FBI and have been since July 2024. Prior to my employment with the FBI, I worked with health care providers, patients, and health insurances for approximately five years. I am currently assigned to investigate financial crimes, specifically health care fraud.

2. During the five months I spent training to be a Special Agent at the FBI Academy in Quantico, Virginia, I received training on the execution of arrest and search warrants, interview and interrogation techniques, investigative tools, and how to identify individuals who facilitate/participate in criminal activity. During my time working as a Special Agent in the field, I have participated in investigations of criminal activity that include health care fraud, loan fraud, and cyber enabled fraud. During the course of these investigations, I have conducted surveillance, interviewed subjects, witnesses and victims involved in financial crimes, analyzed financial and telephone records and I have reviewed claims data, medical records and other business records. With my previous work experience in healthcare and my training and work experience as a Special Agent, I am familiar with the behaviors and methods used by individuals who commit healthcare fraud and other types of fraud. In addition to this, I

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

have received specialized training in the field of financial crimes and investigative methods used by law enforcement to disrupt and dismantle criminal activity.

3. The facts contained in this Affidavit are based on my personal knowledge, observations and participation in this investigation, my training and experience, and facts relayed to me by other law enforcement officers, witnesses, and documents. Statements attributable to individuals herein are set forth in sum and substance and in part.

**The Defendant and Related Entities and Individuals**

4. The defendant ABRAMOV, a dual citizen of the United States and Azerbaijan, believed to be residing in Kings County, New York, with a residential address of 2552 E. 7th Street, Apt 2B, Brooklyn, New York, is employed as a Relationship Manager at Financial Institution 1 beginning in or around at least May 2021 and is assigned to a branch located in Sheepshead Bay in Kings County, New York.

5. Co-conspirator 1, an Estonian national, at certain times controlled various durable medical equipment ("DME") companies, including ARGO MEDICAL SUPPLIES & SERVICES INC ("ARGO"), and was a signatory on financial accounts for each, while he resided in the United States, in Kings County, New York, from July 2023 until he left the United States on or about December 20, 2023.

6. Co-Conspirator 2, a United States citizen, at certain times controlled various DME companies, including ARGO, and was a signatory on financial accounts for those DME companies, including ARGO. On March 22, 2024, Co-Conspirator 2 was arrested on a complaint charging him/her with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 related to his/her involvement in various DME companies that participated in the scheme outlined below, including ARGO.

7. Co-Conspirator 3, an Estonian national, at certain times controlled various DME companies, including KONANIAH MEDICAL EQUIPMENT & SUPPLIES LLC ("KONANIAH") and ALEXANDRIA DURABLE MEDICAL EQUIPMENT, LLC ("ALEXANDRIA DME"), and was a signatory on financial accounts for those DME companies, while he resided in the United States from October 31, 2022, until January 9, 2023, when Co-Conspirator 3 left the United States.

8. Co-Conspirator 4, an Estonian national, at certain times controlled various DME companies, including KONANIAH and ALEXANDRIA DME, and was a signatory on financial accounts for these DME companies while he resided in the United States starting on June 13, 2023. On February 16, 2024, Co-Conspirator 4 was arrested on a complaint charging him/her with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 related to his/her involvement with these DME companies.

9. Co-Conspirator 5, an Estonian national, at certain times controlled various DME companies, including G&I ORTHO SUPPLY INC ("G&I ORTHO") and MEDICAL HOME CARE INC. ("MEDICAL HOME CARE"), and was a signatory on financial accounts for these DME companies while he resided in the United States from August 22, 2023 until February 26, 2024, when he left the United States via vehicular crossing at the Mexican border and thereafter flew to Europe.

10. Co-Conspirator 6, a Czech national, at certain times controlled various DME companies, including MEDICAL HOME CARE and ROYCE MEDICAL SUPPLY LLC ("ROYCE"), and was a signatory on those entities' financial accounts while he resided in the United States from January 8 through 28, 2023 and from February 27 through March 24, 2023.

11. Co-Conspirator 7, a dual citizen of the United States and Azerbaijan, who performs money laundering services and is the owner of various companies, including ROYAL GOODS INC ("ROYAL GOODS") and AGL USA INC ("AGL USA"). On September 18, 2024, Co-Conspirator 7 was arrested on a complaint charging conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) related to his/her involvement in the scheme described below.

12. Co-Conspirator 8, a dual citizen of the United States and Azerbaijan, was employed as a Relationship Manager at Financial Institution 2, beginning in or around at least November 2021, and was assigned to a branch located in Kings County, New York.

13. Co-Conspirator 9, a dual citizen of the United States and Russia, was employed as a Relationship Manager at Financial Institution 1, beginning in or around at least July 2023, and was assigned to a branch located in Kings County, New York.

14. ARGO, formed in 2020 and located in Staten Island, New York, operated as a DME provider and had been approved by Medicare to supply medically necessary DME to beneficiaries. According to financial documentation, starting on or about December 19, 2023, Co-Conspirator 1 and Co-Conspirator 2 jointly controlled a bank account at Financial Institution 1 for ARGO.

15. KONANIAH, formed in 2015 and located in Dallas County, Texas, operated as a DME provider and had been approved by Medicare to supply medically necessary DME to beneficiaries. According to financial documentation, starting on or about September 28, 2023, Co-Conspirator 4 solely controlled a bank account at Financial Institution 1 for KONANIAH.

16. ALEXANDRIA DME, formed in 2019 and located in Campbell County, Kentucky, operated as a DME provider and had been approved by Medicare to supply medically necessary DME to beneficiaries.

17. ROYCE, formed in 2022 and located in Broward County, Florida, operated as a DME provider and had been approved by Medicare to supply medically necessary DME to beneficiaries.

18. NEPTUNE MEDICAL & SURGICAL SUPPLY, INC ("NEPTUNE"), formed in 2008 and located in Kings County, New York, operated as a DME provider and had been approved by Medicare to supply medically necessary DME to beneficiaries.

19. MY SLEEP APNEA, LLC ("MY SLEEP APNEA"), formed in 2012 and located in Collier County, Florida, operated as a DME provider and had been approved by Medicare to supply medically necessary DME to beneficiaries.

20. G&I ORTHO, formed in 2021 and located in Kings County, operated as a DME provider and had been approved by Medicare to supply medically necessary DME to beneficiaries.

21. MEDICAL HOME CARE, formed in 1977 and located in Fairfield County, Connecticut, operated as a DME provider and had been approved by Medicare to supply medically necessary DME to beneficiaries.

22. AGL USA, formed in 2018 and located in Staten Island, New York, has a primary address listed as the home address of Co-Conspirator 7. AGL USA has no online web presence and does not appear to be a health care-related business. According to financial documentation, Co-Conspirator 6 controlled a bank account at Financial Institution 1 for AGL USA, which received deposits containing fraudulently obtained proceeds from multiple DME

companies. Based on my training and experience, these types of businesses are formed to act as "shell companies" to make funds received appear as legitimate sources of income.

23. ROYAL GOODS, formed in 2018 and located in Staten Island, New York, has a primary address listed the home address of Co-Conspirator 7. ROYAL GOODS has no online web presence and does not appear to be a health care-related business. According to financial documentation, Co-Conspirator 7 controlled a bank account at Financial Institution 1 for ROYAL GOODS, which received deposits containing fraudulently obtained proceeds from multiple DME companies. Based on my training and experience, these types of businesses are formed to act as "shell companies" to make funds received appear as legitimate sources of income.

**Relevant Financial Accounts**

24. On September 28, 2023, KONANIAH opened business account x9165 at Financial Institution 1 ("KONANIAH ACCOUNT"). Co-Conspirator 4 opened the KONANIAH ACCOUNT on behalf of KONANIAH and was the sole signatory.

25. On October 24, 2023, G&I ORTHO opened business account x5260 at Financial Institution 1 ("G&I ORTHO ACCOUNT"). Co-Conspirator 5 opened the G&I ORTHO ACCOUNT on behalf of G&I ORTHO and was the sole signatory.

26. On October 25, 2023, MEDICAL HOME CARE opened business account x5286 at Financial Institution 1 ("MEDICAL HOME CARE ACCOUNT"). Co-Conspirator 5 opened the MEDICAL HOME CARE ACCOUNT on behalf of MEDICAL HOME CARE and was the sole signatory.

27. On December 19, 2023, ARGO opened business account x9152 at Financial Institution 1 ("ARGO ACCOUNT"). Co-Conspirators 1 and 2 opened the ARGO ACCOUNT on behalf of ARGO and were the sole signatories.

28. On May 24, 2021, AGL USA opened business account x2935 at Financial Institution 1 ("AGL USA ACCOUNT"). Co-Conspirator 7 opened the AGL USA ACCOUNT on behalf of AGL USA and was the sole signatory.

29. On May 23, 2023, ROYAL GOODS opened business account x8713 at Financial Institution 1 ("ROYAL GOODS ACCOUNT"). Co-Conspirator 7 opened the ROYAL GOODS ACCOUNT on behalf of ROYAL GOODS and was the sole signatory.

**The Medicare Program**

30. The Medicare program ("Medicare") is a federally funded health insurance program providing health benefits to individuals who are 65 years of age or older or disabled. Medicare is administered by the Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS").

31. Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

32. Individuals who qualify for Medicare benefits are commonly referred to as "beneficiaries." Each beneficiary is given a unique Medicare identification number.

33. Medicare covers different types of benefits, which are separated into different program "parts." Medicare Part B covers medically necessary physician services and outpatient care, including DME, such as prosthetics, orthotics, continuous glucose monitors, urinary catheters, and braces.

34. DME companies, physicians, and other health care providers (collectively, "providers") that provide items or services to beneficiaries are able to apply for and obtain a National Provider Identifier ("NPI"). To participate in Medicare, providers are required to submit an enrollment application. As provided in the application, every provider is required to meet certain standards to obtain and retain billing privileges with Medicare, including: (1) provide complete and accurate information on the application, with any changes to the information on the application reported within 30 days; (2) disclose persons and/or organizations with ownership interests or managing control; (3) abide by applicable Medicare laws, regulations, and program instructions; (4) acknowledge that the payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (5) refrain from knowingly presenting or causing to present a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity. Providers are provided with online access to Medicare manuals and service bulletins describing proper billing procedures and billing rules and regulations.

35. Upon a change in ownership or managing control to an enrolled Medicare provider, the provider is required to re-submit an enrollment application setting forth details of the new ownership, including the names of all owners and managing employees, contact information, and a certification by any new individuals that they will abide by Medicare rules and regulations. The enrollment application must be approved by Medicare before the provider can be reimbursed for claims following a change in ownership or managing control.

36. If Medicare approves the application, Medicare assigns the provider a Provider Transaction Access Number ("PTAN"). Providers assigned a Medicare PTAN to

render services to beneficiaries can submit claims for reimbursement to Medicare that include the PTAN assigned to that provider. Payments under Medicare are often made directly to the provider rather than to a Medicare beneficiary. This payment occurs when providers submit the claim to Medicare for payment, either directly or through a billing company. CMS contracts with various companies to receive, adjudicate, process, and pay Medicare Part B claims, including claims for DME.

37. Under Medicare Part B, DME is required to be reasonable and medically necessary for the treatment or diagnosis of the patient's illness or injury, ordered by a medical professional, properly documented, and provided as represented to Medicare.

38. Medicare uses the term "ordering/referring" provider to identify the physician or nurse practitioner who orders, refers, or certifies an item or service reported in that claim. Individuals who order, refer, or certify these items or services are required to have the appropriate training, qualifications, and licenses.

39. A Medicare claim is required to set forth, among other things, the beneficiary's name, the date the items or services are provided, the cost of the items or services, the name and identification number of the physician or other health care provider who orders the items or services, and the name and identification number of the provider who provides the items or services. Providers convey this information to Medicare by submitting claims using billing codes and coding modifiers, which provide additional information about the medical procedure, service, or supply involved.

40. Medicare regulations require providers to maintain complete and accurate patient medical records reflecting the medical assessments and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom items or services are

provided and for whom claims for payment are submitted. Medicare requires complete and accurate patient records so that Medicare can verify that the items or services are provided as described on the claim form and to permit Medicare to review the appropriateness of payments made to providers.

41. Medigap, also known as Medicare Supplemental Insurance, helps fill "gaps" of Medicare coverage and is sold by private health insurance companies. A Medigap plan can help pay some of the remaining health care costs not covered by Medicare, such as copayments, coinsurance, and deductibles. For DME claims, a Medigap plan generally covers the beneficiary's deductible which is approximately 20% of the claim's allowed amount.

## **Probable Cause**

### **A. Overview of Investigation**

42. This investigation began in Spring 2023, when the FBI and the Department of Health and Human Services, Office of Inspector General ("HHS-OIG") identified a nationwide scheme to defraud numerous health care benefit programs, including Medicare and Medigap Supplemental Insurers, by submitting claims for DME, specifically, for continuous glucose monitors and urinary catheters, which were neither medically necessary nor provided as represented. The investigation revealed that several associated individuals, both domestic and abroad (the "Organization"), purchased DME companies that were already enrolled with Medicare and other health care benefit programs, changed the ownership information with the respective secretaries of state utilizing the names of nominee owners, but failed to submit enrollment applications reflecting the change in ownership with the health care benefit programs. The Organization further directed nominee owners to open bank accounts in the names of the DME companies for the purpose of receiving the proceeds of the fraud scheme. Following

purported sales of DME to customers, the DME companies submitted tens to hundreds of millions of dollars in claims to Medicare and other health care benefit programs for DME, primarily continuous glucose monitors and urinary catheters, that were not medically necessary and were not dispensed as represented. Medicare and other health care benefit programs have reimbursed tens to hundreds of millions of dollars for these fraudulent claims. After receiving the reimbursements, monies were deposited into financial accounts controlled by the Organization. Members of the Organization subsequently transferred the fraudulent proceeds to other financial accounts, including accounts located overseas. Investigators have identified at least twenty DME companies across the country that participated in this scheme, including ARGO, KONANIAH, ALEXANDRIA DME, ROYCE, NEPTUNE, MY SLEEP APNEA, G&I ORTHO, and MEDICAL HOME CARE.

**B. Health Care Fraud and Wire Fraud – Specified Unlawful Activities (DME Companies)**

**1. ARGO MEDICAL SUPPLIES & SERVICES INC**

43. On or about August 30, 2023, ARGO was sold to Co-Conspirator 1 for a purchase price of approximately $460,000.00. Co-Conspirator 1 signed the purchase agreement as the buyer. When Co-Conspirator 1 took ownership of ARGO, a Medicare enrollment application was not submitted for a change of ownership, as required by Medicare. In or around December 2023, Co-Conspirator 2 took over ownership and control of ARGO.

44. Beginning on or about November 7, 2023, Medicare began receiving telephone calls from beneficiaries to Medicare’s complaint hotline, 1-800-MEDICARE, about ARGO. The hotline receives calls from the public regarding any Medicare-related issues, including fraud, waste, abuse, or quality of care issues. Between November 7, 2023, and September 6, 2024, Medicare received approximately 8,258 complaints listing ARGO as the

subject of the complaint, and many of the beneficiaries reported that they received no items or services from ARGO. On or about December 6, 2023, HHS-OIG Office of Investigation ("OI") also began receiving complaints regarding ARGO. Between December 6, 2023, and September 10, 2024, OI received approximately 146 complaints listing ARGO as the subject of the complaint, and many of the beneficiaries reported that they received no items or services from ARGO.

45. An analysis of ARGO's Medicare billing records indicates that ARGO billed Medicare for supplying items from October 20, 2023, through May 23, 2024, for approximately 557 beneficiaries who had been deceased for 30 or more days. Medicare providers who repeatedly bill for items or services provided to dead beneficiaries are often using Medicare beneficiary information that has been purchased or unlawfully transferred, rather than collected in the ordinary course of their provision of bona fide medical services to beneficiaries. As such, repeated billing of items or services to dead beneficiaries is an indicator that the entity is engaged in fraudulent billing for items or services that are not medically necessary and/or not actually provided.

46. Analysis of ARGO's Medicare billing records for the same time period also indicates that approximately 95% of beneficiaries had no prior relationship with the referring provider. Again, Medicare providers who repeatedly bill for services rendered to beneficiaries who did not have an established relationship with the referring provider are often using Medicare beneficiary information that has been purchased or unlawfully transferred rather than collected in the ordinary course of their provision of bona fide medical services to beneficiaries. As such, repeated billing for items or services purportedly referred by providers who did not have an established relationship with beneficiaries is an indicator that the entity is

engaged in fraudulent billing for items or services that are not medically necessary and/or not actually provided.

47. Investigators interviewed five beneficiaries who allegedly received catheters. All five beneficiaries denied receiving any catheters from ARGO and stated that they had never heard of the referring provider or ARGO.

48. Between October 20, 2023, through May 23, 2024, after Co-Conspirator 1 and Co-Conspirator 2 took control of ARGO, ARGO submitted claims to Medicare for urinary catheters in the amount of approximately $730,927.890.00 and was paid approximately $194,720,880.00. This represented an extraordinary spike in billing compared to the historical business of ARGO.

49. A review of ARGO's financial records revealed activity inconsistent with the running of a large-scale urinary catheter business. For example, a detailed review was unable to conclusively identify a large and consistent stream of expenses tied to business activities typically expected with the operation of a urinary catheter business, such as a large volume of catheter purchases, shipping or packaging fees, and/or storage fees. Furthermore, most of the funds that flowed into the ARGO financial accounts were then quickly withdrawn, with some funds being sent to foreign bank accounts, including to accounts in China.

50. Between December 1, 2023, and January 11, 2024, financial records show that Co-Conspirator 1 or Co-Conspirator 2 initiated six wire transfers for total of $865,210.78 from ARGO's account at Financial Institution 1 to a bank account in the name of HENGRUN TRADING CO LTD, a Hong Kong-based business.

51. On or about January 29, 2024, financial records show that Co-Conspirator 1 or Co-Conspirator 2 initiated two wire transfers for a total of $351,540.00 from ARGO's

account at Financial Institution 1 to a bank account in the name of XINC TRADE LIMITED, a Hong Kong-based business.

52. These wire transfers were of fraud proceeds from Medicare and the Medigap supplemental insurance company reimbursements, which provided a sufficient balance in AGRO's account at Financial Institution 1 to perform these wire transfers since there were no significant deposits in the account from any other source.

**2. KONANIAH MEDICAL EQUIPMENT & SUPPLIES LLC**

53. On or about December 9, 2022, KONANIAH was sold to Co-Conspirator 3 for a purchase price of approximately $300,500.00. Co-Conspirator 3 signed the purchase agreement as the buyer. When Co-Conspirator 3 took ownership of KONANIAH, a Medicare enrollment application was not submitted for a change of ownership, as required by Medicare. On or about July 21, 2023, Co-Conspirator 4 took over control of KONANIAH.

54. On or about December 12, 2022, a Certificate of Amendment to KONANIAH's Entity Information was filed with the Office of the Secretary of State of Texas, Corporations Sections listing Co-Conspirator 3 as President and Director and while removing the prior owner. On or about July 21, 2023, a Certificate of Amendment to KONANIAH's Entity Information was filed listed Co-Conspirator 4 as President and Director while removing Co-Conspirator 3; and again, no enrollment was submitted to Medicare reflecting the change in ownership, as required by Medicare.

55. Beginning on or about January 23, 2023, Medicare began receiving telephone calls from beneficiaries to Medicare's complaint hotline, 1-800-MEDICARE, about KONANIAH. Between January 23, 2023, and September 14, 2024, Medicare received approximately 36,746 complaints listing KONANIAH as the subject of the complaint, and many

of the beneficiaries reported that they received no items or services from KONANIAH. On or about February 7, 2023, OI also began receiving complaints regarding KONANIAH. Between February 7, 2023, and September 13, 2024, OI received approximately 619 complaints listing KONANIAH as the subject of the complaint, and many of the beneficiaries reported that they received no items or services from KONANIAH.

56. An analysis of KONANIAH's Medicare billing records indicates that KONANIAH billed Medicare for supplying items from January 11, 2023, through February 16, 2024, for approximately 811 beneficiaries who had been deceased for 30 or more days.

57. Analysis of KONANIAH's Medicare billing records for that same time period also indicates that approximately 96% of beneficiaries had no prior relationship with the referring provider.

58. Investigators interviewed six beneficiaries who allegedly received glucose monitoring devices. All six beneficiaries denied receiving any glucose monitoring devices from KONANIAH and stated that they had never heard of the referring provider or KONANIAH.

59. Between January 11, 2023, and February 16, 2024, after Co-Conspirator 3 and Co-Conspirator 4 took control of KONANIAH, KONANIAH submitted claims to Medicare for glucose monitoring devices and/or urinary catheters in the amount of approximately $777,376,624.00 and was paid approximately $222,535,542.00. This represented an extraordinary spike in billing compared to the historical business of KONANIAH.

60. A review of KONANIAH's financial records revealed activity inconsistent with the running of a large-scale urinary catheter and/or glucose monitoring device business. For example, a detailed review was unable to conclusively identify a large and consistent stream of expenses tied to business activities typically expected with the operation of a urinary catheter

and/or glucose monitoring device business, such as a large volume of urinary catheter or glucose monitoring device purchases, shipping or packaging fees, and/or storage fees.

61. On or about December 1, 2023, and on or about December 12, 2023, financial records show Co-Conspirator 4 initiated two wire transfers for total of $66,940.08 from KONANIAH's account at Financial Institution 1 to a bank account in the name of HK KTS TRADING CO., LIMITED, a Hong Kong-based business.

62. On or about February 2, 2024, and on or about February 5, 2024, financial records show Co-Conspirator 4 initiated two wire transfers for a total of $311,533.00 from KONANIAH's account at Financial Institution 1 to a bank account in the name of WANJIAHUI CO., LIMITED, Hong Kong-based business.

63. These wire transfers were of fraud proceeds from Medicare and the Medigap supplemental insurance company reimbursements, which provided a sufficient balance in KONANIAH's account at Financial Institution 1 to perform these wire transfers since there were no significant deposits in the account from any other source.

**3. <u>G&I ORTHO SUPPLY INC</u>**

64. On March 6, 2023, G&I ORTHO was sold to Co-Conspirator 6 for a purchase price of approximately $400,000.00. When Co-Conspirator 6 took ownership of G&I ORTHO, a Medicare enrollment application was not submitted for a change of ownership, as required by Medicare.

65. Beginning on approximately March 30, 2023, Medicare began receiving telephone calls about G&I ORTHO from beneficiaries to Medicare's complaint hotline. Between on or about March 30, 2023, and on or about November 1, 2023, Medicare received

approximately 19,321 beneficiary complaints listing G&I ORTHO as the subject of the complaint, many of whom reported that they received no services from G&I ORTHO.

66. An analysis of G&I ORTHO's billing records by Medicare indicates that G&I ORTHO billed for services from March 30, 2023, through November 1, 2023, for approximately 507 beneficiaries who had been deceased for 30 or more days.

67. On July 17, 2023, investigators interviewed a current employee of G&I ORTHO, who was hired after applying to a posting on Indeed.com. The employee worked at G&I ORTHO's location in New York. The employee's job duties were to handle mail and go to the bank to deposit checks. The employee communicated with her employers through Telegram. The employee started each workday by going to the post office box for G&I ORTHO and picking up multiple bags of mail to be brought to the G&I ORTHO office. There, the employee would send photographs of the checks received from health insurance providers to her employers via email, text message, or Telegram. The employee was told that the checks were for medical items and assumed that the medical items were supplied by a company in Texas. After sending photos of the checks, the employee would be told where the checks would be deposited and went to the banks twice per week to deposit the checks. On two occasions, the employee was asked to fly to Fort Lauderdale, Florida, to retrieve the mail for ROYCE, where the employee followed the same process as at G&I ORTHO. The employee has never seen customers come into G&I ORTHO and reports that G&I ORTHO does not ship medical supplies to any customers.

68. Investigators interviewed five beneficiaries who allegedly received catheters from G&I ORTHO, and all five beneficiaries denied receiving any catheters from G&I ORTHO.

69. Between March 6, 2023, and present, following the sale to Co-Conspirator 6, G&I ORTHO submitted claims to Medicare for urinary catheters and knee braces in the amount of approximately $1,078,242,550, and was reimbursed approximately $2,598,900.31. This, again, represented a large spike in billing compared to the historical business of G&I ORTHO.

**4. <u>MEDICAL HOME CARE INC.</u>**

70. On March 17, 2023, MEDICAL HOME CARE was sold to Co-Conspirator 6 for a purchase price of approximately $400,000.00. When Co-Conspirator 6 took ownership of MEDICAL HOME CARE, a Medicare enrollment application was not submitted for a change of ownership, as required by Medicare.

71. On October 20, 2023, an interim notice was filed with the Connecticut Secretary of State listing Co-Conspirator 5 as President of MEDICAL HOME CARE and removing Co-Conspirator 6.

72. Beginning on approximately April 7, 2023, following the sale of MEDICAL HOME CARE to Co-Conspirator 6, Medicare began receiving telephone calls about MEDICAL HOME CARE from beneficiaries to Medicare's and its contractor's complaint hotlines. From April 7, 2023, through February 9, 2024, Medicare received approximately 27,377 beneficiary complaints listing MEDICAL HOME CARE as the subject of the complaint, many of whom reported that they received no items or services from MEDICAL HOME CARE.

73. An analysis of MEDICAL HOME CARE's billing records by Medicare indicates that MEDICAL HOME CARE billed for items from March 17, 2023, through June 1, 2024, for approximately 711 beneficiaries who had been deceased for 30 or more days.

74. Investigators interviewed nineteen beneficiaries who allegedly received catheters from MEDICAL HOME CARE, as well as three providers who allegedly prescribed catheters to those beneficiaries. All nineteen Medicare beneficiaries interviewed denied receiving any catheters from MEDICAL HOME CARE. The three referring providers interviewed denied prescribing and/or ordering catheters and additionally denied that any of the identified individuals were patients of their respective practices.

75. A review of MEDICAL HOME CARE's financial records did not reveal financial activity consistent with the running of a large-scale urinary catheter business. For example, a detailed review was unable to conclusively identify a large and consistent stream of expenses tied to business activities typically expected with the operation of a urinary catheter business, such as catheter purchases, shipping and packaging fees, and/or storage fees.

76. On June 16, 2023, investigators interviewed the former owner of MEDICAL HOME CARE, who advised that he/she received daily phone calls from people in other states complaining about items billed by MEDICAL HOME CARE, including catheters that the patients stated they never received. The former owner described the sale process as the "strangest deal" he/she had ever been involved in. The former owner never met Co-Conspirator 6 but did see a copy of his/her driver's license and recalled it was from the State of Texas. The former owner stated that the buyers did not want any of MEDICAL HOME CARE's equipment, software, or employees.

77. On August 18, 2023, investigators interviewed an employee of MEDICAL HOME CARE, who was hired after responding to a posting for an office manager position on Indeed.com. The employee worked at MEDICAL HOME CARE a few times a week, and the employee's job duties were obtaining and going through the mail, scanning and faxing the mail,

and sending it to the owners. The employee told investigators that he/she was told that the business was not officially open, and that the employee's job was to take care of the office and the mail until the business opened. The employee reported that no other employees came to the business. The only individuals who arrived at the business complained that they did not get the goods billed by the company. The employee told investigators that MEDICAL HOME CARE was not selling any material, and that there was no material coming in or out of the company.

78. On or about May 17, 2023, MEDICAL HOME CARE began submitting claims to Medicare for urinary catheters in a significant and unusual manner. From approximately May 17, 2023, to June 1, 2024, MEDICAL HOME CARE billed 469,288 claims for 96,146 Medicare beneficiaries, totaling approximately $952,802,335.00 billed to Medicare for urinary catheters for an intended paid amount of approximately $152,305,817.00.

### C. ABRAMOV's Involvement in the Fraudulent Scheme

79. Starting in at least May 2021, ABRAMOV has served as a Relationship Manager at Financial Institution 1, whose duties include providing advice and financial solutions to business banking clients and prospects, including opening financial accounts.

80. Despite the fact that Co-Conspirator 4[2] at the time resided in New York County, New York, where there existed at least one branch of Financial Institution 2 within walking distance of his/her residence, the Organization directed Co-Conspirator 4 via Telegram, a messaging service that allows users to send end-to-end encrypted messages, to travel to Kings County, New York, to meet with Co-Conspirator 8, who was employed at Financial Institution 2

---

[2] As noted above, Co-Conspirator 4 was arrested on February 16, 2024, and was charged with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 in connection with this investigation. Co-Conspirator 4 is providing information in the hopes of obtaining a favorable outcome in his case, including leniency at sentencing.

as a Relationship Manager, to open a business account for KONANIAH. Prior to meeting with Co-Conspirator 8, Co-Conspirator 4 was sent copies of the bill of sale, meeting minutes, and purchase agreement for KONANIAH, which he/she was instructed to print and present to Co-Conspirator 8. Co-Conspirator 8 advised Co-Conspirator 4 that he/she could not open an account for KONANIAH at Financial Institution 2.

81. The Organization then directed Co-Conspirator 4 via Telegram to travel to a Kings County, New York branch of Financial Institution 1 located on Kings Highway, to meet with Co-Conspirator 9 to open a business account for KONANIAH. Co-Conspirator 4 provided Co-Conspirator 9 with the same documents that he/she had provided to Co-Conspirator 8. Co-Conspirator 4 met with Co-Conspirator 9 on two different occasions to open the account, but Co-Conspirator 9 did not open the account because he/she stated that some documents were missing.

82. Then, in September 2023, the Organization directed Co-Conspirator 4 through Telegram to travel to another Kings County, New York branch of Financial Institution 1, located in Sheepshead Bay, to meet with ABRAMOV, again to attempt to open a business account for KONANIAH. Co-Conspirator 4 took a taxi to the branch location and waited outside until he/she received a message on Telegram instructing him/her to enter the branch. Co-Conspirator 4 provided the same documents to ABRAMOV that he/she had provided to Co-Conspirator 8 and Co-Conspirator 9. During Co-Conspirator 4's conversations with ABRAMOV, he/she and ABRAMOV spoke Russian. On September 28, 2023, ABRAMOV successfully opened the KONANIAH ACCOUNT for Co-Conspirator 4.

83. Co-Conspirator 4 is an Estonian national who entered the United States on through the ESTA program on June 14, 2023. The ESTA program did not permit Co- Conspirator 4 to legally work in the United States. When traveling to the United States through

the ESTA program, travelers may only stay in the United States up to 90 days per visit, with a reasonable amount of time in between visits. By the time Co-Conspirator 4 succeeded in opening the KONANIAH ACCOUNT, he/she had overstayed the 90 days permitted under the ESTA program and no longer had legal authority to be in the United States.

84. The KONANIAH ACCOUNT signature card, which was executed by Co-Conspirator 4, lists KONANIAH as an Individual Owner/Sole Proprietor/Single Member LLC, of which Co-Conspirator 4's title is listed as "member."

85. The KONANIAH ACCOUNT signature card contains a check box, instructing: "Nonresident Alien (NRA) Status: Check this box if the account holder of this account is a non U.S. entity/person (NRA) for U.S. tax purposes. Have them complete and sign the applicable Form(s) W-8." The box was not checked, despite that Co-Conspirator 4 was a nonresident alien.

86. The KONANIAH ACCOUNT signature card also requires presentation of an Internal Revenue Service ("IRS") Form W-9, which is a Request for Taxpayer Identification Number and Certification. Co-Conspirator 4 was not provided with or instructed to bring KONANIAH's IRS Form W-9. In lieu of receiving an entity's IRS Form W-9, the KONANIAH ACCOUNT contains an alternate certification that requires certification by the account holder, *inter alia*, that "I am a U.S. citizen or other U.S. person." As previously discussed, Co-Conspirator 4 was not a U.S. citizen or other U.S. person and had overstayed the 90 days permitted to him under the ESTA program and was in the United States illegally.

87. Despite these issues, ABRAMOV proceeded to open the KONANIAH ACCOUNT for Co-Conspirator 4.

88. This account was used by Co-Conspirator 4 and the Organization to deposit health care fraud proceeds and transfer these funds to other accounts, including businesses operating in Hong Kong.

89. On or around October 24, 2023, ABRAMOV opened the G&I ORTHO account for Co-Conspirator 5.

90. Co-Conspirator 5 is an Estonian national who entered the United States on through the ESTA program on August 22, 2023, and thus had no authority to legally work in the United States.

91. The G&I ORTHO ACCOUNT signature card, which was executed by Co-Conspirator 5, lists G&I ORTHO as a C Corporation, of which Co-Conspirator 5's title is listed as "president."

92. The G&I ORTHO ACCOUNT signature card contains a check box, instructing: "Nonresident Alien (NRA) Status: Check this box if the account holder of this account is a non U.S. entity/person (NRA) for U.S. tax purposes. Have them complete and sign the applicable Form(s) W-8." The box was not checked, despite that Co-Conspirator 5 was a nonresident alien and could not have presented valid documentation demonstrating otherwise to ABRAMOV.

93. On or around October 25, 2023, ABRAMOV opened the MEDICAL HOME CARE account for Co-Conspirator 5.

94. As previously stated, Co-Conspirator 5 is an Estonian national who entered the United States through the ESTA program August 22, 2023, and had no authority to legally work in the United States.

95. The MEDICAL HOME CARE signature card, which was executed by Co-Conspirator 5, lists MEDICAL HOME CARE as a S Corporation, of which Co-Conspirator 5's title is listed as "president."

96. The MEDICAL HOME CARE ACCOUNT signature card contains a check box, instructing: "Nonresident Alien (NRA) Status: Check this box if the account holder of this account is a non U.S. entity/person (NRA) for U.S. tax purposes. Have them complete and sign the applicable Form(s) W-8." The box was not checked, despite that Co-Conspirator 5 was a nonresident alien and could not have presented valid documentation demonstrating otherwise to ABRAMOV.

97. In or around December 2023, Co-Conspirator 2[3] was instructed by the Organization on Telegram to travel to New York to meet Co-Conspirator 1 outside a financial institution to transfer ownership of Co-Conspirator 1's financial accounts to Co-Conspirator 2 in furtherance of Co-Conspirator 2's taking over ownership from Co-Conspirator 1 of various DME companies, including ARGO. Co-Conspirator 2 was instructed by the Organization not to speak with Co-Conspirator 1 about anything outside of the business. Co-Conspirator 1 and Co-Conspirator 2 traveled to Financial Institution 1 and Financial Institution 2 together for this purpose.

---

[3] As noted above, Co-Conspirator 2 was arrested on March 22, 2024, and was charged by complaint with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 in connection with this investigation. He has since been charged by Information with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). Co-Conspirator 2 is providing information in hopes of obtaining a favorable outcome in his case, including leniency at sentencing.

98. On or about December 19, 2023, Co-Conspirator 1 and Co-Conspirator 2 traveled to the Kings County, New York branch where ABRAMOV was employed to open the ARGO ACCOUNT.

99. Co-Conspirator 1 is an Estonian national who entered the United States through the ESTA program in July 2023 and had no authority to legally work in the United States. By the time Co-Conspirator 1 succeeded in opening the ARGO ACCOUNT on December 19, 2023, he/she had overstayed the 90 days permitted under the ESTA program and no longer had legal authority to be in the United States. Co-Conspirator 1 left the United States on or about December 20, 2023, the day after opening the ARGO ACCOUNT.

100. The ARGO ACCOUNT signature card lists Co-Conspirator 1 as "president" of ARGO and Co-Conspirator 2 as "Vice president" of ARGO.

101. The ARGO ACCOUNT signature card contains a check box, instructing: "Nonresident Alien (NRA) Status: Check this box if the account holder of this account is a non U.S. entity/person (NRA) for U.S. tax purposes. Have them complete and sign the applicable Form(s) W-8." The box was not checked, despite that Co-Conspirator 1 was a nonresident alien, and, at that time, had overstayed the ESTA program and was in the United States illegally.

102. Despite this issue, ABRAMOV proceeded to open the ARGO ACCOUNT. This account was used by Co-Conspirator 1, Co-Conspirator 2 and the Organization to deposit health care fraud proceeds and transfer these funds to other accounts, including businesses operating in Hong Kong.

103. ABRAMOV also opened business accounts at Financial Institution 1 for AGL USA, in March 2021, and for ROYAL GOODS, in May 2023, with Co-Conspirator 7 listed as "president" of both entities on their respective signature cards. Co-Conspirator 7 has no

outward connection to any of the DME companies that are subject to this investigation, but nevertheless at certain times received and deposited checks, and/or cashed checks from at least five DME companies connected to the scheme, including ALEXANDRIA DME, ROYCE, NEPTUNE, MY SLEEP APNEA, and G&I ORTHO. Your deponent therefore believes that Co-Conspirator 7 has been utilized by the Organization for the purpose of transferring fraudulent proceeds from the health care fraud scheme in order to conceal the nature, source, and identity of the true owners of the fraudulent proceeds.

104. As noted above, at least twenty DME companies have participated in this scheme throughout the United States. Investigators obtained toll records for cellular telephone numbers subscribed to ABRAMOV, Co-Conspirator 7, and Co-Conspirator 8 and determined that ABRAMOV had ongoing telephonic contact with Co-Conspirator 7, who is believed to have assisted the Organization with money laundering activity, as well as Co-Conspirator 8, a Relationship Manager at Financial Institution 2, who also assisted the Organization in opening business accounts at Financial Institution 2 that should not have been opened. Specifically, the toll records show that between approximately May 29, 2022, and April 12, 2024, ABRAMOV had approximately 288 telephonic contacts with Co-Conspirator 7 and approximately 1,640 telephonic contacts with Co-Conspirator 8.

105. On September 16, 2024, investigators learned that ABRAMOV had booked a one-way flight to Vnukovo International Airport in Moscow, Russia, through Tashkent, Uzbekistan, leaving on September 19, 2024, out of John F. Kennedy International Airport. Although ABRAMOV is still employed with Financial Institution 1, ABRAMOV did not request any leave of absence from his employment for his scheduled trip on September 19, 2024.

**D. <u>Concealment Money Laundering</u>**

106. Based upon my training and experience, and information gleaned throughout this investigation, your deponent believes that the Organization described herein forms relationships with individuals working at United States financial institutions for the purpose of opening financial accounts to provide the Organization access to the United States financial system to deposit checks containing fraud proceeds into United States financial accounts in order to transfer those fraudulent proceeds to other accounts, including overseas accounts.

107. Based on my training and experience, and from information gleaned throughout this investigation, your deponent believes that ABRAMOV, in his role as Relationship Manager at Financial Institution 1, conspired with Co-Conspirator 1 and Co-Conspirator 2 to open a business account at Financial Institution 1 that should not otherwise have been opened for the purpose of concealment money laundering and is part of the Organization's ongoing fraudulent enterprise.

108. Based on my training and experience, and from information gleaned throughout this investigation, your deponent believes that ABRAMOV, in his role as Relationship Manager at Financial Institution 1, conspired with Co-Conspirator 4 to open a business account at Financial Institution 1 that should not otherwise have been opened, for the purpose of concealment money laundering and is part of the Organization's ongoing fraudulent enterprise.

109. Based on my training and experience, and from information gleaned throughout this investigation, your deponent believes that ABRAMOV, in his role as Relationship Manager at Financial Institution 1, conspired with Co-Conspirator 5 to open two

business accounts at Financial Institution 1 that should not otherwise have been opened, for the purpose of concealment money laundering and is part of the Organization's ongoing fraudulent enterprise.

110. Based on my training and experience, and from information gleaned throughout this investigation, your deponent believes that ABRAMOV, in his role as Relationship Manager at Financial Institution 1, conspired with Co-Conspirator 7 to open at least two business accounts at Financial Institution 1 for the purpose of concealment money laundering and is part of the Organization's ongoing fraudulent enterprise.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant RENAT ABRAMOV so that he may be dealt with according to law.

IT IS FURTHER REQUESTED that, because public filing of this document at this time could result in a risk of flight by the defendant, as well as jeopardize the government's investigation, all papers submitted in support of this application, the complaint and arrest warrant, be sealed until further order of the Court.

Catherine Tota
Special Agent
Federal Bureau of Investigation

Sworn to before me by telephone
this _19th__ day of September, 2024

[redacted]
HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK